# AFFIDAVIT

I, Kelly M. Bell, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent for the Federal Bureau of Investigation ("FBI") for more than 17 years. I am currently assigned to the FBI's Boston Field Office, where I investigate wire fraud, bank fraud, money laundering, bankruptcy fraud, and mortgage fraud, among other economic crimes. I have received on-the-job and FBI-sponsored training concerning these types of investigations, which have involved the execution of search, seizure, and arrest warrants.

2. I am currently investigating EDWIN TAVAREZ ("TAVAREZ") for his involvement in wire fraud, in violation of 18 U.S.C. § 1343, and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957 (collectively, the "Target Offenses").

3. I submit this affidavit in support of an application for a criminal complaint charging TAVAREZ with wire fraud, in violation of 18 U.S.C. § 1343, and for a warrant to arrest TAVAREZ. As set forth below, there is probable cause to believe that between in or about March 2015 and at least as late as February 2020, TAVAREZ executed a scheme to defraud a victim of at least $1.5 million by falsely representing that TAVAREZ was developing an industrial property located in Boston's Upham's Corner neighborhood ("the Property").

4. I also submit this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the mobile phone assigned 617-543-4320 (the "Target Mobile Phone"), that is believed to be used by TAVAREZ. The service provider for this phone is AT&T Wireless ("AT&T"), a wireless telephone service provider that accepts service of process at AT&T Global

Legal Demand Center, AT&T Corporation, 11760 U.S. Highway 1, North Palm Beach, Florida 33408, gldc@att.com.  The Target Mobile Phone is further described in Attachment A to the proposed search warrant, and the location information to be seized is further described in Attachment B to the proposed search warrant.

5. There is probable cause to believe that the location information described in Attachment B to the proposed search warrant will constitute evidence of the Target Offenses.  The location information described there will also assist law enforcement in arresting TAVAREZ, who will be a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4) in the event the accompanying complaint and arrest warrant sought herein issue.

6. The facts in this affidavit come from my participation in this investigation, including my personal observations and review of records, my training and experience, and information obtained from other law enforcement personnel and witnesses.  In submitting this affidavit, I have not included every fact known to me about this investigation.  Rather, I have included only those facts that I believe are sufficient to establish probable cause for the criminal complaint.

**PROBABLE CAUSE**

At all times relevant to this affidavit:

7. Between in or about 2015 and in or about 2020, TAVAREZ resided in Massachusetts.  Since in or about 2020, TAVAREZ is believed to have resided in New York.

8. TAVAREZ owned New Oro Bar Restaurant LLC, which did business in the Bronx, New York as Oro Restaurant.  Documents on file with the New York Department of State, Division of Corporations show that New Oro Bar Restaurant LLC was established in or

about 2015 with TAVAREZ as its registered agent.

9. "Victim" was a resident of Massachusetts and owned an automotive repair business located in Boston.

10. "Owner" was a resident of Massachusetts. For the past 40 years, Owner, either individually or through a limited liability company, has owned the Property, a parcel of land in the Upham's Corner neighborhood of Boston which features a large, industrial warehouse. Neither Owner nor anyone else has developed the Property, and Owner has never received any money for the development or sale of the Property. Owner has never met or communicated with TAVAREZ.

11. The Massachusetts Bay Transportation Authority ("MBTA") was the agency responsible for operating most public transportation services in greater Boston.

12. The Boston Planning and Development Agency ("BPDA") was the municipal planning and economic development agency for the City of Boston.

13. LTK Engineering Services was a consulting firm dedicated exclusively to the passenger rail industry.

## Overview of the Fraud Scheme

14. According to the Victim, TAVAREZ was a customer of the Victim's business.

15. In or about 2015, TAVAREZ proposed to the Victim that the two of them should purchase the Property and develop it into residential condominiums and retail space. TAVAREZ proposed a 50/50 partnership, with TAVAREZ and the Victim each investing about $700,000 or $800,000.

16. TAVAREZ told the Victim that they would earn between $17 million and $18 million on the project.

17. Between in or about March 2015 and in or about February 2020, the Victim gave TAVAREZ more than $1.5 million dollars, including personal checks and cash payments. The Victim recorded the amounts paid to TAVAREZ in a detailed, handwritten ledger.

18. For part of the investment, at TAVAREZ's direction, the Victim wrote checks totaling $570,184 to TAVAREZ or to New Oro Bar Restaurant LLC. On several occasions, TAVAREZ told the Victim how much money TAVAREZ needed for expenses related to the development of the Property, and the Victim wrote checks totaling that amount. Either TAVAREZ or TAVAREZ's father visited the Victim to pick up the checks.

19. According to the Victim, for the remainder of the investment, the Victim paid TAVAREZ in cash.

20. The Victim intended for all of the money he gave to TAVAREZ to be used to develop the Property or to help obtain financing for the project.

21. TAVAREZ and the Victim did not sign an investment contract, and TAVAREZ did not give the Victim any documents related to the real estate development project. They did, however, discuss the project via text messages, which the Victim has provided to me.

### Text Messages from TAVAREZ to the Victim

22. I have reviewed text messages between TAVAREZ and the Victim that were exchanged between on or about May 24, 2019 and on or about June 30, 2020. TAVAREZ used the Target Mobile Phone's number to exchange these messages with the Victim. In these text messages, some of which are reproduced below, TAVAREZ updated the Victim about his purported progress on the development of the Property. TAVAREZ also asserted that he and the Victim would make a large profit when the development of the Property was complete.

23. For example, on or about June 2, 2019, TAVAREZ wrote to the Victim: "We got our demo permit. All but two tenant will be a hold out but we look like heroes- we gave everybody extensions- but really we weren't ready anyway."

24. On or about June 6, 2019, TAVAREZ wrote to the Victim: "I need a favor because now the MTA/DOT threw us a curveball – on ur way home or whatever can u swing by the site and see if NATIONAL GRID and or FEENEY construction has been working at the corner of [redacted] and [redacted]?[1] How are u? By the way I know the exterminators were there Monday but they said nobody from any utility was workin there yet." The Victim responded "Ok," then TAVAREZ continued: "Thanks!! I just have to keep everybody on schedule and big utility doesn't communicate efficiently. Thanks for doin that – looks like they been there bout two days – the main building tie in to utilities is on the currently open lot – they're setting up the connections for us to pick up gas/electric/fiber optic because there'd never been anything there before."

25. On or about June 27, 2019, TAVAREZ wrote to the Victim: "any minute now the MBTA advisory board will sign off on original design- cantilever- do not disturb tracks- heavy alloy supports only to stabilize, not to bear weight, on far end. They canceled the meet for this past Monday on the 12th- said submit that portion of plan to LTK Engineering- same guys they're usin to solve all the derailments they've suffered this year. It's been a nightmare no wonder nobody touched that for YEARS. But screw it we're here now and it's gettin done and the Fed didn't raise rates. We'll just raise our price per square foot."

26. Approximately two months later, on or about August 20, 2019, TAVAREZ wrote to the Victim again: "we've passed approval on every agency. We just need mbta blessing on

---

[1] The redacted names are of the street corner in Boston where the Property is located.

LTK recommendations. The fckers broke session until Labor Day. We are on agenda for when they return week of Sept 3." On or about August 26, 2019, TAVAREZ continued: "And even if the first thing the mbta does next week is approve our stuff – it will be 2 more weeks before the plans are printed and actually presented to BPDA."

27. On or about September 8, 2019, TAVAREZ wrote to the Victim again: "I'll call a meet w the [Owner] Family.. they have always been upset, as have you, at how long everything is takin in general. They think the mbta won't approve. And they are very close to agreeing w our plans. We'll go public upon permit issuance. Don't freak out. Our proposal is much more lucrative for them/for everyone really. That was August 30th…I'll have our attorneys inquire as well. Plus – they CANNOT back out of our agreement unless we agree to it and it would take alotta money for us to walk away."

28. On or about September 26, 2019, TAVAREZ wrote to the Victim: "Can't wait to hand u a pile of money boss! It'll b my proudest moment cause it means I'm LOADED too."

29. On or about October 7, 2019, TAVAREZ wrote to the Victim regarding interest rates on a construction loan for the purported development. TAVAREZ then asked the Victim if there was "any chance u can swing 7? 6 won't cover," referring to a request that the Victim contribute an additional $7,000 to the purported development project, instead of the $6,000 they had previously discussed. TAVAREZ further arranged for his father to pick up a check from the Victim the next day. On or about October 8, 2019, TAVAREZ wrote the victim that his father could not pick up the check because he was sick, and asked the Victim to deposit the money into a TD Bank account ending in 4166 in the name of New Oro Bar (the "4166 Account"). When the Victim asked TAVAREZ where he was, TAVAREZ replied, "NY." TD Bank records for the 4166 Account show that TAVAREZ was the only authorized signer on the 4166 Account. TD

Bank records further show that, on or about October 7, 2019, the debit card associated with the 4166 Account was used to make purchases at a Home Depot and McDonald's in the Bronx, New York. The Victim was located in Massachusetts at this time.

30. On or about November 23, 2019, TAVAREZ wrote to the Victim: "Can't wait to hand you the first $1million cash."

31. On or about February 3, 2020, TAVAREZ wrote to the Victim: "When we file for our permit end of next week… I wanna apply for an immediate temporary permit for demo! shouldn't be an issue cause the projects a green light and they'll b able to leisurely review plans while we clean up the current shithole."

32. The Victim last received a text message from TAVAREZ in or about March 2020. The Victim continued to reach out to TAVAREZ at the Target Mobile Phone's number, with no response, through in or about June 2020.

33. As of in or about June 2020, TAVAREZ had initiated no development at the Property and had not returned any of the Victim's money.

34. I have interviewed the Owner, who reported that he has never had contact with TAVAREZ or any representative of TAVAREZ and that he has not entered any agreements concerning the development of the Property with TAVAREZ or anyone else.

35. I have reviewed records from the Suffolk County Registry of Deeds and found no records indicating that TAVAREZ or the Victim had any interest in the Property.

36. I have reviewed City of Boston records and consulted an employee at the City's Inspectional Services Department, which issues building permits in the City of Boston. According to City of Boston records, from in or about 2015 to in or about 2022, there were no permit applications submitted, and no permits issued, for the Property.

37. I interviewed an employee of the MBTA Advisory Board, who explained that the MBTA Advisory Board has purview over the MBTA's budget but has no authority over real estate development and does not issue licenses or approvals. The MBTA Board of Directors is a separate organization that has delegated authority to Greystone Management Solutions for licensing and access to MBTA-owned property.

38. According to Greystone, from in or about 2015 to in or about 2022, there were no applications for licensing and no licenses issued for development of the Property.

39. According to Hatch LTK (formerly LTK Engineering Services), from in or about 2015 to in or about 2022, the company had no involvement with a development project at the Property and no record of any interaction with TAVAREZ or any representative of TAVAREZ.

### The Ledger

40. As mentioned above, the Victim kept a detailed, handwritten ledger of payments to TAVAREZ.

41. On or about October 8, 2019, the Victim sent a series of text messages to TAVAREZ that included the note "Update on monies…." and photographs of two pages of the ledger, as follows:

**163**

| Date | Description | | Amount | Balance |
|---|---|---|---|---|
| 2017 | 2017 | | | 1,125,606.00 carryover |
| 8/3 | Cash | | | 65000.00 |
| | New Balance | | ✓ | 1,190,606.00 |
| 9/5 | Cash | | | 10,000.00 |
| | | | | 1,200,606.00 |
| 10/1 | Cash 10,000⁰⁰ 5000 CR | | | 15000.00 |
| | | | | 1,215,606.00 |
| 11/2 | | | | 4050.00 |
| | | | | 4050.00 |
| | | | ✓ | 1,223,706.00 |
| 11/9 | | | | 3000.00 |
| 11/21 | | | | 3000.00 |
| 12/13 | | | | 4000.00 |
| | | | | 2500.00 |
| 12/14 | | | | 4000.00 |
| | 2018 | | ✓ | 1,240,206.00 |
| 1/10 | All cash | | | 25640.00 |
| 1/10 | All CASH | | | 6000.00 |
| 4/18 | New Oro BAR (EASTON BANK) | | | 25000.00 |
| 4/18 | "    "    "  ( "     " ) | | | 26000.00 |
| 5/25 | "    "    "  (TO BANK) | | | 25000.00 |
| | | | ✓ | 1,347,846.00 |
| 6/8 | "    "    " | | | 4550.00 |
| | "    "    " | | | 4850.00 |
| | "    "    " | | | 600.00 |
| 6/20 | "    "    " | | | 4950.00 |
| | "    "    " | | | 4950.00 |
| | CASH | | | 100.00 |
| | | | ✓ | 1,367,846.00 |
| 6/28 | | | | 4995.00 |
| 7/10 | | | | 4995.00 |
| 9/11 | | | | 5000.00 |
| 9/26 | | | | 5000.00 |
| | | | ✓ | 1,387,836.00 |

164

| Date | Description | Amount |
|---|---|---|
| | | 1,387,836.00 |
| | **2018** | |
| 10/2 | New Oro | 5500.00 |
| 10/20 | CK# 479 | 5000.00 |
| 12/19 | CK# 502, 503, 504, 505, 506 | 22,500.00 |
| | CK# 507, 508 | 7,600.00 |
| | | 1,427,936.00 |
| | **2019** | |
| 1/7 | CK# 518, 519 | 7000.00 |
| 2/2 | CK# 535 (Payroll) Pers | 4500.00 |
| 2/19 | CK# 539 (Payroll) " | 3500.00 |
| 2/25 | CK# 542 New Oro B/R | 4500.00 |
| 3/7 | E.D.T. Personal | 4900.00 |
| 4/5 | New Oro  CK# 555 | 3500.00 |
| | "   "   CK# 556 | 2500.00 |
| 4/23 | "   "   CK# 564 | 4500.00 |
| 4/23 | "   "   " 565 | 2500.00 |
| 4/29 | "   "   " 568 | 4500.00 |
| 4/29 | "   "   " 569 | 3500.00 |
| 5/15 | "   "   " 574 | 3500.00 |
| 5/15 | "   "   " 575 | 3500.00 |
| 5/20 | "   "   " 577 | 3500.00 |
| 5/21 | "   "   " 578 | 3500.00 |
| 8/30 | "   "   " 614 | 4500.00 |
| 8/30 | "   "   " 615 | 3000.00 |
| 9/9 | "   "   " 619 | 3850.00 |
| 9/9 | "   "   " 620 | 3650.00 |
| | | 1,502,336.00 |
| 9/25 | "   "   " 625 | 4500.00 |
| 9/27 | "   "   " 626 | 4500.00 |
| 10/8 | "   "   " 630 | 4500.00 |
| 10/8 | "   "   " 117 | 4500.00 |
| | | 1,515,836.00 |

42.     On the same day, after receiving photos of the two ledger pages, TAVAREZ responded to the Victim: "Can I be honest?! I've been jottin down last 6months and not added it up yet… so in my head- I thought it was much MUCH more!"

43.     I have reviewed the two ledger pages that the Victim sent to TAVAREZ. They show that as of October 8, 2019, the Victim had given TAVAREZ $1,515,836.

### TAVAREZ's Expenditure of the Victim's Funds

44.     I have reviewed records for a TD Bank personal checking account ending in 2495 in the name of TAVAREZ (the "2495 Account").

45.     These records indicate that between in or about September 2015 and in or about November 2017, TAVAREZ deposited 28 checks from the Victim and one check from the Victim's son[2], totaling $120,367, into the 2495 Account. TAVAREZ also deposited $48,700 in cash into this account and received only $6,053 in other deposits.

46.     Between in or about September 2015 and in or about November 2017, TAVAREZ appears to have spent none of the money from the 2495 Account for expenses related to real estate development. Instead, TAVAREZ withdrew $76,603 in cash, paid $16,131 to various retail shops, spent $14,222 at casinos, and paid $16,525 to Credit One Bank for credit card expenses for an account in TAVAREZ's name. According to Credit One Bank records, TAVAREZ incurred the charges at restaurants, hotels, gas stations, parking meters, retail shops, liquor stores, and casinos.

47.     I have also reviewed records for a TD Bank savings account ending in 2992 in the name of TAVAREZ (the "2992 Account").

---

[2] According to the Victim and the Victim's son, the check from the son was intended to be used toward the Victim's investment in the property.

48.     Between in or about March 2016 and in or about January 2017, TAVAREZ deposited five checks from the Victim totaling $20,626 into the 2992 Account. There were no other deposits into that account. TAVAREZ either withdrew or transferred all of the Victim's money from the 2992 Account to the 2495 Account or to another TD Bank checking account ending in 4132 in the name of New Oro Bar Restaurant LLC, on which TAVAREZ was the only authorized signer (the "4132 Account").

49.     I have reviewed records for the 4132 Account. On or about August 24, 2016, TAVAREZ deposited a $5,000 check from the Victim into the 4132 Account. On or about January 4, 2017, TAVAREZ transferred $7,000 of the Victim's money from the 2992 Account to the 4132 Account. TAVAREZ spent none of these amounts on expenses related to real estate development. Instead, he spent the money on cell phone bills and at restaurants, retail stores, and casinos in Connecticut and New Jersey.

50.     I have also reviewed records for the 4166 Account discussed above. Between in or about April 2018 and in or about May 2020, when this account was closed, TAVAREZ deposited 50 checks from the Victim totaling $267,590 into the 4166 Account. During the same period, TAVAREZ deposited $5,803 in cash into this account and received only $1,871 in other deposits.

51.     Between in or about April 2018 and in or about May 2020, TAVAREZ appears to have spent none of the money from the 4166 Account for expenses related to real estate development. Instead, he withdrew $186,284 in cash, spent $16,638 at casinos, made $13,606 in purchases at various retail stores, and spent $11,471 on liquor and cigars.

52.     In addition to the deposits described above, TAVAREZ also cashed many of the Victim's checks without depositing them into any bank account.

Casino Gambling

53. Between in or about 2015 and in or about 2020, TAVAREZ gambled large sums of money at two casinos located in Connecticut. He also spent several nights at the casinos' hotels.

54. Between in or about January 2015 and in or about July 2018, TAVAREZ gambled hundreds of thousands of dollars on table games and slot machines at the Mohegan Sun Casino, resulting in total losses, according to the casino's records, of $91,708. Between 2015 and 2018, TAVAREZ spent 105 nights at the Mohegan Sun hotel.

55. Between in or about April 2015 and in or about February 2020, TAVAREZ gambled hundreds of thousands of dollars on table games and slot machines at the Foxwoods Resort Casino, resulting in total losses, according to the casino's records, of $97,482. Between in or about 2017 and in or about 2019, TAVAREZ spent 27 nights at the Foxwoods hotel.

The Target Mobile Phone

56. As discussed above, TAVAREZ used the Target Mobile Phone to communicate with the Victim. The Victim last received a message from TAVAREZ in or about March 2020. According to AT&T records, since on or about October 14, 2019, the Target Mobile Phone has been subscribed to Patricia Pena Marte of Bronx, New York. Her connection to TAVAREZ is unknown at this time.

57. On or about October 4, 2022, an investigator posing as a representative of Optimum Internet contacted TAVAREZ via WhatsApp using the 617-543-4320 phone number associated with the Target Mobile Phone. The male who answered identified himself as TAVAREZ and confirmed he resided at 4777 Barnes Avenue, 1st Floor, Bronx, New York, but stated that he was not home and would not be home until the weekend. Investigators have

conducted surveillance at this address on various occasions in the past month but have yet to see TAVAREZ entering or exiting the building.

58. Based on the information set forth above, as well as my training and experience, I submit that there is probable cause to believe that (a) TAVAREZ used the Target Mobile Phone to communicate with the Victim in furtherance of the Target Offenses, including via phone calls and text messages; (b) the Target Mobile Phone will accordingly contain evidence of the commission of the Target Offenses, including its location during the commission of the Target Offenses; (c) prospective location information will help locate the Target Mobile Phone for the purpose of obtaining a warrant to seize and search it; and (d) the location information will help locate TAVAREZ.

The Relevant Technology

59. I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (a) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (b) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a

wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

Authorization Request

60. I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.[3]

61. I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the Target Mobile Phone on AT&T's network, and at such intervals and times as directed by the government. The government will compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

62. I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order AT&T not to notify any person (including the subscribers or customers to whom the materials relate) of the existence of this application, the warrant, or the execution of the warrant, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b). AT&T may disclose this Order to an attorney for AT&T for the purpose of receiving legal advice. Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither

---

[3] 18 U.S.C. 2703(c) authorizes a "court of competent jurisdiction" to issue a search warrant for the kinds of records that this application seeks. A "court of competent jurisdiction" includes a district court ("including a magistrate judge") that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

public nor known to TAVAREZ, and its disclosure may alert TAVAREZ to the existence of the investigation. There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by: giving TAVAREZ an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or intimidate potential witnesses. See 18 U.S.C. § 2705(b). Moreover, some of the evidence in this investigation is stored electronically. If alerted to the existence of the Order, TAVAREZ could destroy that evidence, including information saved to his personal computers, other electronic media, or in social media accounts.

63. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay any required notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Mobile Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

64.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Mobile Phone outside of daytime hours.

65.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court, except that the government may produce them in criminal discovery and provide the search warrant to AT&T.  These documents discuss an ongoing criminal investigation that is neither public nor known to TAVAREZ.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## CONCLUSION

66.     Based on the foregoing, I respectfully submit that there is probable cause to believe that TAVAREZ committed wire fraud, in violation of 18 U.S.C. § 1343, on or about October 8, 2019, by sending a text message to the Victim, who was located in Massachusetts, from New York, in furtherance of the scheme to defraud the Victim of more than $1.5 million.

67.     Based on the foregoing, I further request the Court issue the requested location warrant for service on AT&T.

_____
KELLY M. BELL
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me telephonically pursuant to Fed. R. Crim. P. 4.1. this **Oct 17, 2022** day of October 2022.

_____
HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE