UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | DOCKET NO.: 1: 23-cr-10102-LTS |
| v.   ) | |
| ) | |
| EDWIN TAVAREZ ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

At 48 years old, Edwin Tavarez, a man who has built his life around the singular goal of caring and providing for his family, now stands convicted of a felony offense – not just the first and only conviction on his criminal record, but which will forever affect not just his reputation and employability, and his ability to provide for his three daughters. In taking responsibility for defrauding, P.F., the victim in this case, Mr. Tavarez knows that he alone is responsible for the consequences he must now face. And in entering into a plea agreement with the government that ensures the finality of his conviction, he stands ready to accept this Honorable Court's judgment and to begin to make sincere and serious amends for his conduct.

We submit that <u>a time-served sentence, with three years of supervised release</u> to follow, is an appropriate disposition in this case and is "minimally sufficient to achieve the broad goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008). Where Mr. Tavarez has complied with all pretrial release conditions for over a year, a period of supervised release to be served on home confinement would also be appropriate in this case.

We also propose special conditions of supervised release which will address Mr. Tavarez's specific risk of recidivism and provide necessary treatment. Specifically, consistent with Probation's recommendations, we recommend that in addition to paying restitution for his crimes,[1]

---

[1] Undersigned counsel submits that she has not received any documents or requests relative to the victim's request for restitution at the time of this filing. Should the parties not have final restitution

Mr. Tavarez be prohibited from engaging in any kind of gambling activities, that he stay away from all such establishments, and that he participate in gambling-specific treatment (including but not limited to Gamblers Anonymous).

Though we submit that the 3553(a) factors support a sentence that focuses on rehabilitation as a primary sentencing goal and considers Mr. Tavarez's demonstrated amenability to rehabilitation, the proposed sentence also considers the nature and seriousness of the offense, his personal history, and the impact that incarceration would have on him and his young daughters. The proposed sentence – which contemplates treatment in the community and restitution – will also deter future criminal conduct, protect the public, and ensure Mr. Tavarez's continued work towards living a lawful and productive life.

## BACKGROUND AND HISTORY OF EDWIN TAVAREZ

Edwin Tavarez grew up in an area of Dorchester "where crime and violence were common," and where there was frequent "gang activity." Presentence Report ("PSR") at ¶ 50. Though his mother tried to shield him from the dangers outside their home, often "prohibit[ing] him from going outside," he was exposed to issues at home as well. *Id.* Though his father did not drink alcohol at home, he often came home drunk and was an inveterate gambler who "created serious financial issues for the family" and forced the family to rely on government assistance to provide food for Mr. Tavarez and his siblings. *Id.*[2] Family outings for the Tavarez family often consisted of Mr. Tavarez's father taking the children "to the racetracks so that he could gamble, and they could eat out." *Id.*

Throughout his childhood and teenage years, Mr. Tavarez threw himself into school and

---

figures by the sentencing hearing, undersigned counsel requests that a further date for restitution hearing be set within 90 days of the date of sentencing.

[2] *See also* Addendum to PSR. Counsel included information about Mr. Tavarez's personal history which was disclosed and discussed at the presentence interview but, due to new U.S. Probation policy, was not included in the final draft of the PSR.

2

work to avoid both the perils of his neighborhood and the issues of his father's drinking and gambling. He graduated from Boston Latin and worked triple and overtime shifts at a security company to try to provide for himself and his mother, and to stay busy. *Id.* at ¶¶ 51, 58.

He married his first wife – his childhood sweetheart and next-door neighbor – and together they had a daughter. *Id.* at ¶ 54. Though he and his wife ultimately divorced, they have remained on good terms and have a successful and collaborative co-parenting relationship for their daughter, who is now 18 years old. *Id.*

Though his relationship with his father over the years has never been very close, Mr. Tavarez was extremely close to his mother, Paula, who died after being sick and disabled for many years. Well into his adulthood, Mr. Tavarez lived at home in the same apartment where he grew up, so that he could continue to care for his mother. He eventually moved into his own place with his wife, just around the corner from the family apartment, so that he could remain close to his mother. Paula suffered from complications from diabetes, which resulted in a below-knee amputation and which confined her to bed or a wheelchair for years before her passing. *Id.* at ¶ 52; *see also* PSR Addendum. She later suffered a stroke and was diagnosed with colon cancer. *Id.* His mother's prolonged illnesses and her death took an enormous toll on both Mr. Tavarez and his sister, as they were her primary caregivers. *Id.*

Mr. Tavarez later moved to New Jersey and began a relationship with his now-fiancé. Together, they have a six-year-old daughter, and she has an eight-year-old daughter from a prior relationship, but Mr. Tavarez is and always has been the only real father she has known. *Id.* at ¶ 53. Though his fiancé has worked part-time as a waitress, Mr. Tavarez has really been the sole breadwinner for the family, and he continues to provide for his 18-year-old daughter as well. *Id.* at ¶¶ 53-54.

In recent years, his paternal half-brother, Josser, moved in with Mr. Tavarez and his family,

3

and Mr. Tavarez has been both father figure and caretaker for him. *Id.* at ¶ 52; *see also* PSR Addendum. Josser, now 18 and the same age as Mr. Tavarez's eldest daughter, moved to New Jersey from a rural village in the Dominican Republic, and has struggled to adjust and acclimate to life here. *Id.* He depends immensely on Mr. Tavarez, and Mr. Tavarez has been helping him study for and obtain his G.E.D. *Id.*

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

It is telling – though neither justification nor excuse – that the purported investment plan that gave rise to the Information in this case was first conceived and broached in the aftermath of Mr. Tavarez's mother's death. *See id.* at ¶¶ 8, 10. Indeed, after his mother's death, Mr. Tavarez felt adrift – personally and professionally. He worked consistently in various fields, taking every overtime shift and job available to him. But he struggled to get into a good place financially. And unfortunately, the behavior and gambling habits he saw in his father when he was growing up became as deeply engrained in his own life. What may have started as sincere intentions to co-invest and develop an industrial property with P.F. quickly spiraled out of control as Mr. Tavarez got in way over his head, accumulating gambling debts faster than he could invest, all the while hiding his struggles from his family and – most importantly – from the victim. Had he sought out and received help for what is now clear was a crippling gambling addiction, no doubt inherited from and modeled by his father, he could have avoided burying himself in this enormous financial hole and could have salvaged not just the victim's money, but his friendship.

With the benefit of hindsight and reflection, Mr. Tavarez keenly understands exactly how the events of this case unfolded and how and why he spiraled out of control. As evidenced by records obtained and provided by the government of Mr. Tavarez's gambling at local casinos, the

great majority of the money in this case fed his gambling addiction.[3] That he continued to ask for, and take, the victim's money for years knowing that he would be unable to show the proof or fruits of the real estate development plans shows not just how far in over his head he was, and also how fundamentally broken and servile he became to his own compulsions and gambling addiction. Though the victim did invest in a separate business venture (a restaurant operated by Mr. Tavarez in New York), Mr. Tavarez fully and without equivocation owns the fraud that he perpetuated in this case and intends to do whatever is necessary to make P.F. whole.

## ARGUMENT

### A SENTENCE OF TIME SERVED IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO EFFECTUATE THE SENTENCING GOALS OF 18 U.S.C. § 3553(a).

The United States Supreme Court, recognizing the immense discretion afforded to sentencing judges, advised that sentencing courts should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The First Circuit stressed that sentencing determinations require a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and that, at least in the federal context, the federal statutory factors to be considered are "a tapestry of factors, through which runs the thread of an overarching principle [of parsimony]." *See United States v. Rodriguez,* 527 F.3d at 228, citing *Kimbrough v. United States,* 562 U.S. 85, 101 (2007). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the court should "consider all the relevant factors" and "construct a

---

[3] Though the government's sentencing memorandum indicates that Mr. Tavarez spent more than $14,000 at casinos in a two-year period, records provided by the government from at least two local casinos show cash buy-ins and bets at amounts that *far exceed* that amount and that *substantially escalate* during the period of this offense. The records also unfortunately reflect that Mr. Tavarez's gambling was consistent and problematic even before his conduct in this case.

5

sentence that is minimally sufficient to achieve the broad goals of sentencing." *Id.*

Where society's interest in, and need for, retribution, deterrence, and protection are concerned, first-time offenders like Mr. Tavarez – with no prior criminal record, and a severe gambling addiction – represent a special case. The proposed disposition and sentence herein are crafted specifically to enable him to address and treat the very issues which caused to him to offend in the first place. He asks this Court to recognize that his offense is not indicative of his whole character, but a function of his gambling addiction, and to impose a sentence that will enable him to seek meaningful treatment in the community and repay the victim. With this in mind, we submit that rehabilitation and restitution should be the primary goals and focus of the sentence. A time-served sentence with three years of supervised release and conditions designed to address and treat his gambling addiction and to permit him to work and repay the victim serves and fulfills the sentencing goals of rehabilitation and deterrence.

The Government's sentencing memorandum rightly focuses on Mr. Tavarez's conduct and on the harm suffered by the victim. Indeed, Mr. Tavarez offers no excuse for his conduct and choices in the fraud for which he now stands convicted – which he demonstrated by pleading guilty to an Information early in the case and entering into a plea agreement with the government which requires substantial restitution. He is deeply remorseful for defrauding the victim and betraying his trust, and, plainly, knows and fully accepts that it was wrong. What counsel offers herein, however, is the critical context to understand why Mr. Tavarez first engaged in this fraud and did so for so long, and what will be necessary to achieve both just punishment and rehabilitation.

### I. U.S. Sentencing Guidelines, and Appropriate Downward Departures & Variances

While courts must *consider* the sentencing guidelines, the Supreme Court has held that the Court may not presume that the guideline sentencing range is reasonable, and Congress has *required* federal courts to impose the least amount of imprisonment necessary to accomplish the

purposes of sentencing as set forth in 18 U.S.C. § 3553(a). *Kimbrough*, supra; *Gall v. United States*, 552 U.S. 38 (2007). We submit that, regardless of the guideline sentencing range as determined by the Court, the guidelines pertaining to offenses of this type are a poor measure of culpability and should ultimately be given little weight when all the § 3553(a) factors are considered. We also submit that Mr. Tavarez merits either a downward departure or variance for several reasons.

*Guidelines Calculation*

The parties and Probation agree on the offense level calculation and on the guideline sentencing range. As a preliminary matter, the parties and Probation agree that – notwithstanding the calculation contained in the Plea Agreement at D.E. # 18, where Mr. Tavarez has no Criminal History points, a two-level reduction in offense level is appropriate pursuant to the Sentencing Commission's recent amendment to the sentencing guidelines. U.S.S.G. § 4C1.1. Specifically, with a base offense level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1), a 16-level increase pursuant to § 2B1.1(b)(1)(I), and a 2-level reduction pursuant to § 4C1.1, Mr. Tavarez's total offense level with acceptance is 18. At Criminal History Category I, with no prior convictions, the advisory guideline sentencing range is 27-33 months.

*Problems with, and Unfairness of, the Loss-Driven Fraud Guideline*

In this case, U.S.S.G. § 2B1.1 provides for a 16-level increase to the offense level based on the loss amount, regardless of whether actual or intended, which *just* exceeds $1.5 million. This loss-driven guideline considers neither Mr. Tavarez's motivations for engaging in the scheme, nor any of his individual characteristics. A sentencing process driven by a finding of loss, as here and in most fraud cases, ignores many crucial elements of § 3553(a). See *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (noting that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y 2006), *aff'd* 301 Fed. Appx. 93 (2d Cir. 2008) (lamenting "the utter travesty of

justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense).

Indeed, Courts have often recognized that the financial guideline is crude and frequently ill-fitting:

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

*United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012). In an earlier decision, Judge Rakoff observed: "[a]s many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as [] the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *Adelson,* 441 F.Supp.2d at 510, *citing generally* Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998). Further observing that the "vast increase in white collar sentencing was partly mandated by Congress, reacting in turn to public outcry over such massive frauds as Enron and WorldCom," Judge Rakoff noted that "in implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense." *Id*. *See also United States v. Musgrave,* 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, ***it is particularly appropriate for variances***.") (emphasis added).

Demonstrating the arbitrariness set by loss-amount enhancements, had the loss amount been just $15,836 less, a 14-level increase would have applied, with a resulting guideline

sentencing range of 21-27 months. *See* U.S.S.G. § 2B1.1(b)(1)(H). It is for perhaps this reason that the government recommends a sentence of 21 months, but Mr. Tavarez submits that even that reduced guideline range would not appropriately reflect the necessary sentencing factors. He submits that a sentenced focused on restitution and rehabilitation more accurately balances the sentencing factors and goals set forth in 18 U.S.C. § 3553(a).

*Downward Departure and/or Variance: Diminished Capacity/Gambling Addiction*

Counsel acknowledges that U.S.S.G. § 5H1.4 excludes gambling addiction as a physical or mental condition requiring a departure but submits that Mr. Tavarez's gambling addiction warrants a diminished capacity departure under U.S.S.G. § 5K2.13. Specifically, "diminished capacity claims are governed *solely* by § 5K2.13." *United States v. Quinn*, 566 F. App'x 659, 671 (10th Cir. 2014) (quoting *United States v. Sheehan*, 371 F.3d 1213, 1218 (10th Cir. 2004)) (emphasis added). As a result, this court may depart downward if the defendant "suffer[ed] from a significantly reduced mental capacity which contributed substantially to the commission of the offense." *Id.* at 672. *See also United States v. Iaconetti*, 59 F. Supp. 2d 139, 145-46 (D. Mass. 1999) ("Iaconetti's gambling compulsion is plainly relevant here […] Whether this gambling compulsion stands on its own or as a basis for a departure under U.S.S.G. § 5K2.13, it is plainly an important part of an aberrant conduct analysis."). Where grounds for a departure are appropriate but excluded from the guidelines, consideration of conditions that "had a substantial bearing" on a defendant's behavior "should be considered in fashioning [] punishment." *United States v. Whigham*, 754 F. Supp. 2d 239, 248 (D. Mass. 2010). Mr. Tavarez's gambling addiction is precisely the type of diminished mental capacity contemplated by § 5K2.13 where it had a substantial bearing on his behavior and contributed to the commission of the offense, especially as it was born and bred from a young age, he was generationally predisposed and exposed to it.

Volitional impairments – "an inability to control behavior that the person knows is

9

wrongful" – constitute a "significantly reduced mental capacity" under § 5K2.13. *See United States v. Sadolsky*, 234 F.3d 938 (6th Cir. 2000). A court may thus depart when a defendant's "volitional impairment [] explains the motive for the ultimate crime" and was "the driving force" behind it. *Id.* at 943. Like substance-use disorders, gambling addictions "physically hijack[] the brain," thereby "diminish[ing] the addict's capacity to evaluate and control his or her behaviors." *United States v. Dikiara*, 50 F. Supp. 3d 1029, 1032 (E.D. Wis. 2014) (internal quotation omitted).[4] Thus, "[r]ather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences." *Id*. For precisely these reasons, the American Psychiatric Association classifies gambling disorder as an addiction-related disorder.[5]

Federal courts have accordingly departed downwards when a defendant exhibits a substantial gambling addiction. *See e.g., Sadolsky*, 234 F.3d at 942-43 (departing downward under § 5K2.13 for a gambling addiction); *United States v. Liu*, 267 F. Supp. 2d 371, 375 (E.D.N.Y. 2003) (holding that defendant convicted of using unauthorized credit card convenience checks had a pathological gambling addiction that warranted downward departure under § 5K2.13).

Importantly, Mr. Tavarez's gambling problem need not be the sole cause to warrant departure. *See McBroom*, 124 F.3d at 548 n.14 (a defendant's compulsion "must be a contributing cause of the offense, but need not be the sole cause"); *United States v. Shore,* 143 F. Supp. 2d 74, 80 (D. Mass. 2001) (rejecting the argument that § 5K2.13 requires "that the condition be the but-for or sole cause of the offense."); *United States v. Cantu*, 12 F.3d 1506, 1515 (9th Cir. 1993) (stating that "other circuits are unanimous in holding that the disorder need be only a contributing cause, not a but-for cause or a sole cause, of the offense"); *Sadolsky*, 234 F.3d at 943 (noting that

---

[4] Also citing S. H. Dakai, *Compulsive Gambling: An Examination of Compulsive Gambling, Including Pathology, Chemistry Exchange, Similarities to and Differences from Substance Abuse, Gambling Phases, and Assessment Questionnaires*, J. ADDICTIVE DISORDERS, 8-9 (2004)).
[5] *See* Diagnostic and Statistic Manual of Mental Disorders -5-TR.

10

§ 5K2.13 departures are appropriate for "defendants who are compulsive gamblers for crimes other than, but motivated by, a gambling compulsion"); *see also United States v. Harris,* 1994 WL 683429 at *4-5 (S.D.NY 1994) (citing two unpublished district court cases in the Second Circuit where compulsive gamblers were granted downward departures for crimes of embezzlement and mail theft to fund their gambling). For these reasons, a downward departure under U.S.S.G. § 5K2.13 would be warranted here.

If this court declines to depart downward under § 5K2.13, we request a downward variance. A variance would be particularly appropriate here where Mr. Tavarez's actions were driven by addiction rather than greed. *See United States v. Hicks*, 985 F. Supp. 2d 1307, 1310 (M.D. Ala. 2013) (emphasizing that the defendant's "need for cash (which led to his theft of a gun) was driven by addiction to gambling (which was itself associated with his addiction to alcohol), not greed"). *Dikiara* also provides an apt comparison. 50 F. Supp. 3d 1029. There, the defendant embezzled over $1 million from her employer over 11 years by forging the company's name on checks. *Id.* at 1030. The court noted the seriousness of the crime, observing that the defendant's scheme "went on for over a decade, caused substantial losses, and involved a significant abuse of trust." *Id.* at 1031. Even so, the court highlighted the "impact of [the] defendant's gambling addiction on her conduct" and, persuaded that her actions were driven by her addiction rather than "a desire to harm her employer" or "finance a lavish lifestyle," imposed a downward variance. *See id.*

Here, Mr. Tavarez did not commit fraud to fund or fuel an opulent lifestyle, nor did he commit fraud with the intent to harm others – though he knows and understands that was the consequence of his conduct on the victim and his family. To be clear, Mr. Tavarez does not excuse his conduct – he admits that he used the funds for personal expenses and, most substantially, to feed his gambling addiction. But as *Dikiara* reasoned, Mr. Tavarez's gambling addiction tempers his culpability, must be understood in the greater context of his offense, and warrants special

11

consideration at sentencing.

**II. Parental Caretaking and Family Circumstances**

Mr. Tavarez's family circumstances – where he is the sole familial breadwinner, a parent of two young daughters, and caretaker of his brother – militates in favor of a non-jail sentence. Many courts routinely consider a defendant's familial obligations and circumstances in fashioning an appropriate sentence. Massachusetts has even codified that consideration in state sentencings, permitting a defendant to argue, and a sentencing court to consider, "the defendant's status as a primary caretaker of a dependent child before imposing a sentence." M.G.L. c. 279, § 6B(b). In Massachusetts state practice, where a defendant requests consideration of his/her status as primary caretaker of a dependent child, the court is required to make written findings both about the defendant's status and alternatives to incarceration. *Id.*

This consideration of a defendant's parental caretaking status in sentencing is supported by the growing and well-documented scientific and medical evidence that having an incarcerated parent causes both immediate and lasting impacts on the physical and emotional health of children. Parental incarceration is designated as an "Adverse Childhood Experience," or ACE, by the Centers for Disease Control – a classification which also includes physical and sexual abuse, violence and other household challenges, and physical and emotional neglect.[6] Children with an incarcerated parent are more likely to be displaced from their home, become homeless or enter foster care, engage in high-risk behaviors, do poorly in school, and socially isolate themselves.[7]

Mr. Tavarez has never been imprisoned for any period, and his removal from the

---

[6] *About the CDC-Kaiser ACE Study*, https://www.cdc.gov/violenceprevention/acestudy/about.html (last accessed December 7, 2020).
[7] *Keeping Kids and Parents Together: A Healthier Approach to Sentencing in Massachusetts*, September 2017, pages 14-16, https://humanimpact.org/wp-content/uploads/2018/10/KeepingMAKidsParentsTogetherHealthier_2017.09.pdf (last accessed December 7, 2020).

community, from the family home, and from his daughters' and family's lives would be devastating for all of them. He recognizes that it is solely a consequence of his own conduct that he appears before this court to be punished but he wishes above all to avoid inflict further trauma and harm to his family. A community-based sentence – even with a period of home confinement – would allow Mr. Tavarez to maintain parental responsibility and custody, would further disengage him from any criminal activity through intensive supervision, and would ensure his ability to work and pay restitution. Put simply, a non-jail sentence would still hold Mr. Tavarez accountable for his actions and would keep his family together. A community-based sentence also finds support in the evidence that indicates that defendants who remain in a caretaking position for their children generally recidivate less, improve their parenting skills, and are overall more successful with rehabilitative programming.[8]

### III. The Need to Avoid Unwarranted Sentencing Disparities

The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct is codified in 18 U.S.C. § 3553(a)(6). Courts in the District of Massachusetts have routinely meted out below-guideline and probationary sentences for similar offenses. *See e.g., United States v. Pimental*, 367 F. Supp. 2d 143 (D. Mass. 2005) (defendant construction company owner in workers compensation fraud case sentenced to probation where loss figure was $502,332.07); *United States v. Schepps*, No. 11-CR-30016-MAP (D. Mass. Dec. 12, 2014), Sent. Transcript, D.E. # 56, pp. 4-5 (six-month sentence of imprisonment where restitution was $8,759,286 because defendant "primarily perpetrated this fraud for reasons other than selfishness"); *United States v. Smith*, No. 10-cr-10260-DPW (D. Mass. Aug. 25, 2011), Judgment and Statement of Reasons, D.E. # 42 (defendant sentenced to four years' probation for

---

[8] *Id*. at 11-13, 17-18.

wire fraud offense involving more than $200,000 restitution, where GSR was 27-33 months for defendant with TOL 16 an CHC III); *United States v. Nardolillo*, No. 11-cr-10330-WGY (D. Mass. Jan. 10, 2013), Judgment and Statement of Reasons, D.E.# 48 (defendant sentenced to 90 days for wire fraud offense where GSR was 21-27 months); *United States v. Dunn*, No. 12-cr-10224-DPW (D. Mass. Jan. 24, 2014), Judgment and Statement of Reasons, D.E. # 4 (defendant sentenced to three years' probation for wire fraud offense where TOL was 20, CHC II, GSR was 37-46 months).

### IV. The Need to Pay Restitution

The restitution obligation that Mr. Tavarez faces is an important sentencing goal the Court must consider under 18 U.S.C. § 3553(a)(7), and one that counsel submits is of paramount importance here. *See United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense … is better served by a non-incarcerated and employed defendant."). Mr. Tavarez intends to make restitution to the victim, and to cooperate in the government's efforts to collect that restitution. If incarcerated, Mr. Tavarez will not be able to contribute to restitution, and the longer Mr. Tavarez is in prison, the longer he will be unable to contribute in any meaningful way to restitution, and the fewer productive years he will have remaining when he gets out.

Other courts in similar cases have found the need to provide restitution to be an important enough factor to impose a non-jail sentence. *See, e.g., United States v. Edwards,* 595 F.3d 1004 (9th Cir. 2010) (imposing sentence of probation with seven months home detention where defendant was convicted of bankruptcy fraud and guidelines were 27-33 months because "the district judge recognized that restitution serves as a deterrent, and that [t]he term of probation imposed will enable [Edwards] to continue working in order to pay the significant amount of restitution he ow[e]s."); *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (in case

14

of embezzlement of $500,000, no abuse for court to depart downward by eight levels to probation in part because "a sentence of probation may have made Defendant better able to provide restitution to the victims of her crime, *see* 18 U.S.C. § 3553(a)(7)"); *United States v. Bortnick*, 2006 WL 680544 (E.D. Pa., March 15, 2006) (unpub.) (in $8 million dollar fraud case where guidelines were 51-63 months, $1 million dollar fine and sentence of seven days sufficient in part because "Defendant owes a substantial amount of restitution, which he will be able to pay more easily if he is not subjected to a lengthy incarceration period."); *United States v. Peterson*, 363 F.Supp.2d 1060 (E.D. Wisc. 2005) (where defendant pled guilty to defrauding bank of $80,000, court imposed sentence of one day in prison and supervised release of five years so defendant would not lose job and could pay restitution). These cases illustrate the importance of imposing a sentence that permits a defendant to work and to pay meaningful restitution to victims of his offenses.

## CONCLUSION

For the foregoing reasons, the Court should impose the proposed sentence of time served followed by three years of supervised release with the conditions proposed herein, as it is sufficient but not greater than necessary to achieve the purposes of sentencing.

DATED: 11/25/2023

Respectfully submitted,
EDWIN TAVAREZ
By his Attorney

*/s/ Sandra Gant*
Sandra Gant
BBO #: 680122
Federal Defender Office
**Temporary Mailing Address:**
P.O. Box 51268
Boston, MA 02205
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 25, 2023.

                                              */s/ Sandra Gant*
                                              Sandra Gant